## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| TIMBISHA SHOSHONE TRIBE, a federally recognized sovereign nation, 621 West Line St. # 108 Bishop, CA, 93514 | ) ) ) ) ) ) | |
| *Plaintiff,* | ) ) | Case No. 19-cv-1430 |
| vs. | ) ) ) | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| DAVID BERNHARDT, Secretary, United States Department of the Interior, 1849 C St. N.W. Washington, D.C. 20240 | ) ) ) ) ) | |
| JAMES CASON, Associate Deputy Secretary, United States Department of the Interior, 1849 C St. N.W. Washington, D.C. 20240 | ) ) ) ) ) ) | |
| UNITED STATES DEPARTMENT OF THE INTERIOR, a United States federal agency, 1849 C St. N.W. Washington, D.C. 20240 | ) ) ) ) ) ) | |
| *Defendants.* | ) ) | |

1

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff, by and through its counsel, hereby submits the following Complaint for Declaratory and Injunctive relief:

## I.      NATURE OF ACTION

1.      This is an action by the Timbisha Shoshone Tribe (the Tribe or Tribal Plaintiff), a federally recognized sovereign nation, against the United States Department of the Interior (the Department) for the Department's failure to comply with its mandatory duty to accept title to certain land and hold it in trust for the Tribe's benefit. The Tribe is requesting immediate relief because the Department's failure to complete the acquisition in a reasonable time is causing significant harm to Tribal Plaintiff.

2.      The Timbisha Shoshone are the descendants of the Shoshone people who have occupied the desert area that now comprises Death Valley National Park and neighboring areas of California and Nevada since time immemorial. Even though the Tribe was federally recognized as a sovereign nation in 1983, until 2000 it lacked a land base for its people in or near its ancestral homeland, and it still lacks land suitable for residential and economic development consistent with the basic needs and rights of the Tribe.

3.      In an effort to provide the Tribe with land and a reservation, Congress passed the Timbisha Shoshone Homeland Act (the Homeland Act) in 2000. The Homeland Act transferred five federal parcels of land into trust for the benefit of the Tribe. For various reasons, these parcels were deemed not suitable for the type of revenue-generating economic development necessary to reduce the Tribe's dependence on the United States.

4.      The Homeland Act also allows the Secretary to acquire an alternative parcel "mutually agreed upon by the Secretary and the Tribe," and, once identified, creates a discrete, mandatory duty for the Secretary to take the parcel into trust for the Tribe.

5.      The Tribe and the Secretary have mutually agreed on a parcel owned by the City of Ridgecrest in California (the Ridgecrest Parcel), memorialized by a signed Memorandum of Agreement (MOA). The Ridgecrest Parcel will provide the Tribe with a much needed and substantial economic development opportunity in the form of gaming, which has been recognized by the federal government as a means to promote tribal economic development, self-sufficiency, and strong tribal governments. 29 U.S.C. § 2702. More than two years after the Secretary committed to acquire the Ridgecrest parcel, the Secretary has inexplicably failed to comply with his mandatory duty and accept this Parcel into trust for the Tribe.

6.      The Secretary's failure to complete the Ridgecrest Parcel Acquisition is an abdication of the Department's fundamental duties under the Homeland Act. Moreover, the Department's unlawful delay is prejudicing the Tribe, which is dependent on the full implementation of the Homeland Act for economic development to support the health, welfare, and safety of its people. This lawsuit seeks to require the Department to immediately complete the Ridgecrest Parcel Acquisition as required by law.

## II.      JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1362 (Indian Tribes), and 28 U.S.C. § 1346 (United States as a Defendant).

8.      Tribal Plaintiff has a right to bring this action pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 702, 706(1)-(2); 28 U.S.C. § 1651 (writs); and 28 U.S.C. §§ 2201-2202 (declaratory relief).

9.      Venue is proper in this Court under 28 U.S.C. § 1391(e) because Defendant Department of the Interior, having authority over the actions alleged herein, resides in this judicial district.

### III.      PARTIES AND STANDING

10.      Tribal Plaintiff the TIMBISHA SHOSHONE TRIBE is a federally recognized sovereign nation. The Tribe achieved federal recognition in 1983. The Tribe's initial reservation was established by the Homeland Act in 2000. But the Homeland Act contemplates the acquisition of additional lands that are eligible for gaming under the Indian Gaming Regulatory Act (IGRA) as part of the Tribe's initial reservation. Tribal members have a desire and need for housing, government and administrative facilities, and economic development to promote health and welfare and provide safe conditions for themselves and their families.

11.      Defendant DAVID BERNHARDT is the Secretary of the United States Department of the Interior (the Secretary). The Secretary is the federal official in whom the Timbisha Shoshone Homeland Act vests responsibility for making decisions. The Secretary is the official ultimately responsible for acquiring additional trust resources for the Tribe, and completing the mandatory acquisition of additional trust resources.

12.      Defendant JAMES CASON is the Associate Deputy Secretary of the United States Department of the Interior. Defendant CASON assists the Deputy Secretary and therefore the Secretary with the review and management of DEPARTMENT OF THE INTERIOR operations, policies, procedures, regulations, and legislation.

13.     Defendant DEPARTMENT OF THE INTERIOR is a cabinet-level agency within the Executive Branch of the United States Government. It is the federal agency ultimately responsible for the acquisition, management, and protection of Indian trust lands.

## IV.     LEGAL BACKGROUND

### The Timbisha Shoshone Homeland Act

14.     Congress enacted the Timbisha Shoshone Homeland Act, Public L. No. 106-423, Stat. 1875, in 2000.

15.     The Homeland Act mandates the transfer of five non-contiguous federal parcels of land to be held in trust for the benefit of the Tribe and to serve as the Tribe's initial reservation.

16.     The Homeland Act also authorizes the Secretary of the Interior to acquire on behalf of the Tribe two specifically identified parcels from willing sellers, to be placed in trust for the Tribe and considered part of the Tribe's initial reservation. In place of the second parcel, Section 5(d)(2) of the Homeland Act provides that, in the alternative, the Secretary may acquire "another parcel mutually agreed upon by the Secretary and the Tribe."

17.     Specifically, the Homeland Act, section 5(d), provides in relevant part:

(d) ADDITIONAL TRUST RESOURCES.—The Secretary may purchase from willing sellers the following parcels and appurtenant water rights, or the water rights separately, to be taken into trust for the Tribe:

(1) Indian Rancheria Site, California, an area of approximately 120 acres, as generally depicted on the map entitled "Indian Rancheria Site, California" numbered Map #6 and dated December 3, 1999.

(2) Lida Ranch, Nevada, an area of approximately 2,340 acres, as generally depicted on the map entitled "Lida Ranch" numbered Map #7 and dated April 6, 2000, or another parcel mutually agreed upon by the Secretary and the Tribe.

18.     The Homeland Act provides the Secretary with discretion to make the decision as to whether to purchase the two additional parcels for the Tribe. Congress's use of the word "may" illustrates its intent that the Secretary use its discretion in making this decision.

19.     It is also within the discretion of the Secretary and the Tribe to "mutually agree" upon another parcel in place of Lida Ranch. The Secretary and the Tribe can exercise—and have exercised—their independent discretion to agree on an alternate parcel.

20.     The discretionary aspect of the decision ends after that step.

21.     The language "to be taken into trust for the Tribe" is not qualified by the word "may." It is a mandatory directive. Once the Secretary agrees to take the alternate parcel into trust for the Tribe, it must complete the acquisition. *See* Homeland Act, § 5(d)(2).

### Trust Acquisitions by Department of Interior

22.     Department of Interior policy separates fee to trust acquisitions into categories of discretionary and mandatory. Discretionary acquisitions are subject to full review under 25 C.F.R. Part 151, including compliance with the National Environmental Policy Act (NEPA) and opportunities for formal input from adjacent state and local governments. Whereas mandatory acquisitions are specifically authorized by acts of Congress and are considered under an expedited process that does not include NEPA compliance or formal input from adjacent state and local governments. *See* Bureau of Indian Affairs (BIA), Acquisition of Title to Land Held in Fee or Restricted Fee Status (hereinafter, BIA Handbook) § 3.13.

23.     Section 3.13 of the BIA Handbook covers mandatory acquisitions. It defines mandatory acquisitions as those "directed by Congress or a judicial determination that require[] the Secretary to accept title to land into trust, or hold title to certain lands in trust by the United

States, for an individual Indian or Tribe. The Secretary does not have discretion to deny the request to accept title of land into trust." BIA Handbook at 32.

24.    The Department of the Interior has signed an MOA (attached hereto as Exhibit A) regarding the Ridgecrest Parcel mandatory acquisition. Section 4 of the MOA states, in relevant part:

> Purchase.
> a.    Pursuant to the authority of Section 5(d)(2) of the Act, the Secretary hereby agrees to purchase the Ridgecrest Parcel from a willing seller for the sum of one dollar ($1.00) upon the following:
>
> i.    The Submission by the Tribe of a written request for mandatory acquisition of the Ridgecrest Parcel pursuant to the requirements set forth in Section 3.1.3 of the Bureau of Indian Affairs Fee-to-Trust Handbook (2016).

25.    As recently as October 18, 2018, DOI reiterated that its position on the MOA and the mandatory nature of the acquisition remain unchanged.

### Legislative History of the Homeland Act

26.    The legislative history of the Homeland Act indicates that the acquisition of the land, specifically Lida Ranch, was intended to be brief. In a conversation between then Assistant Secretary of the Interior Donald J. Barry and Senator Daniel K. Inouye, the Senator asked: "So, upon passage of this measure and its signing into law, the Department will take that as direction to provide funds to secure the title to this land?" Assistant Secretary Barry responded, "I think the burden is then on us to follow through in good faith to look for a way of trying to achieve the benefits for the tribe that the legislation would authorize." Hearing Before the Committee on Indian Affairs, United States Senate, 106 Cong., S. Hrg. 106-540 (2000) (S. Hrg.) 23.

27.    Senator Inouye also questioned Professor Wilkinson concerning Lida Ranch: "Does this measure provide the necessary authority for the Department to proceed with the

purchase." Professor Wilkinson responded, "Yes, I believe it does." While the words "mandatory" and "discretionary" were not used in either exchange, the Senator's clear intent was to ensure the Department had legal authority to proceed expeditiously, which is inconsistent with the lengthy, off-reservation, discretionary fee to trust acquisition processes. S. Hrg. 34.

***The Administrative Procedure Act***

28.     The APA requires an agency to conclude a matter presented to it "within a reasonable time." 5 U.S.C. § 555(b).

29.     The APA provides that "[a] person suffering legal wrong because of an agency action, or adversely affected or aggrieved by agency action … is entitled to judicial review thereof." *Id*. § 702.

30.     The definition of agency action includes a "failure to act." *Id*. § 555(13).

31.     Under the APA, a reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed." *Id*. § 706(1).

32.     Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Id*. § 706(2).

## V.     FACTUAL BACKGROUND

33.     The Timbisha Shoshone people are the descendants of the Shoshone people who have occupied the desert area in and around Death Valley National Park and extending to the eastern base of the Sierra Nevada range, since time immemorial. In the anthropological record, the Timbisha Shoshone people are often referred to as the Panamint Shoshone or the Koso Shoshone.

34.     The Panamint Shoshone occupied four "districts" (also called bands): Little Lake, Saline Valley, Panamint Valley, and Death Valley.

35.     Through non-native encroachment, the Tribe's use of its territory shrank over time.

36.     The Tribe came under the supervision of the Bureau of Indian Affairs at least as early as 1911, when Tribal children began attending boarding school.

37.     In 1928, a single family of the Tribe, the Hansons, received a reservation in Panamint Valley. This reservation became known as "Indian Rancheria" and is no longer held in trust.

38.     The BIA considered the remainder of the Tribe non-ward Indians.

39.     In 1933, efforts to provide the Tribe with a reservation were stymied by the establishment of the Death Valley National Monument, which made ineligible a significant portion of the Tribe's territory.

40.     Some of the Tribe's people were further displaced in 1943 because most of the Little Lake Band's territory was taken over by the Naval Air Weapons Station China Lake (China Lake Base). Residents of that area were all forcibly removed from their homes at that time.

41.     The Timbisha Shoshone Tribe achieved Federal recognition in 1983 through the Federal acknowledgment process at 25 C.F.R. Part 83. The Tribe was one of the first tribes to secure tribal status through the Bureau of Indian Affairs' Federal Acknowledgment Process. The Tribe still lacked a reservation.

42.     In 1994, Congress adopted the Desert Protection Act, Public L. No. 103-433, 108 Stat. 4471, establishing Death Valley and Joshua Tree National Parks. The Desert Protection Act

also required the Secretary, in conjunction with the Tribe, to identify lands suitable for Tribal Plaintiff's reservation and produce a report to Congress with the results of the study.

43.     The study and report culminated in the Homeland Act. Enacted in 2000, the Homeland Act attempts to balance the interests of the Tribe in acquiring sufficient lands to constitute a reservation with the interests of the United States in keeping Death Valley National Park as intact as possible.

44.     The Homeland Act identifies five non-contiguous parcels of federal land to be held in trust for the Tribe. All five federal parcels were already owned by the United States, but the Homeland Act changed their designation to lands held in trust for the Tribe.

45.     The first parcel, Furnace Creek, is a 314-acre parcel within Death Valley National Park at the Tribe's traditional village site and is not eligible for gaming. Furnace Creek includes the village site and is the only reservation parcel that has a residential population. The Homeland Act specifically limits the development of the parcel to a small to moderate size desert inn and cultural center and allows only fifty single-family residences. This parcel was subject to a considerable amount of planning after passage of the Homeland Act. The Tribe is still hoping to develop this project but has not been able to obtain funding.

46.     Four of the parcels are taken from Bureau of Land Management (BLM) lands. The Act specifies that the four BLM parcels are all eligible for gaming activities under the IGRA. These four parcels all have cultural significance but have not proven capable of supporting any tribal housing or development of the kind that was intended at the time the Homeland Act was passed. Specifically, these parcels are remote, without places of business or schools nearby, they cannot facilitate even small-scale economic development, and at least one lacks sufficient water or resources for development. The Tribe has not been able to establish any

kind of revenue-generating economic development and as such is still stuck in a cycle of economic dependence on the United States. Basic services to Tribal members are either provided through federal grant programs or not at all.

47.     The Homeland Act also authorizes the acquisition of two privately-owned parcels—Indian Rancheria and Lida Ranch—should the owners be willing to sell. These parcels are also eligible for gaming under the IGRA.

48.     The Act further authorizes the Secretary of Interior and the Tribe to agree on an alternate parcel should Lida Ranch not be available. Once the Secretary agrees to take the alternate parcel into trust for the Tribe, it must complete the acquisition, Homeland Act § 5(d)(2), creating a discrete, mandatory duty on behalf of the Secretary.

49.     Shortly after the Homeland Act was passed, the Tribe contacted the owner of Indian Rancheria about acquiring the Rancheria, but the owner was not willing to sell.

50.     The Tribe considered acquiring Lida Ranch, but it was taken off the market in 2014. The Tribe also had concerns about whether Lida Ranch would present the best economic development opportunity for the Tribe. Lida Ranch is an operating cattle ranch and the Tribe's intention was to purchase the land and continue to operate the ranch. However, cattle ranching has low profit margins and presents significant risks, creating a less than ideal economic development opportunity for the Tribe.

51.     Congress was informed and understood that the success of the Homeland Act depended on additional acquisitions. The Senate Committee on Indian Affairs hearing on the Homeland Act prior to its passage confirmed this. S. Hrg. 22-23 (discussing the importance of securing Lida Ranch). The Act itself contemplated gaming as an economic opportunity for the Tribe. Homeland Act § 7(c).

11

52.     Because Lida Ranch was not available, the Tribe identified a substitute parcel, an approximately 26.48-acre parcel of land in Ridgecrest California near the Tribe's ancestral homelands, and which could provide the Tribe a viable economic development opportunity in the form of gaming.

53.     The Ridgecrest Parcel is located on China Lake Boulevard in the City of Ridgecrest, close to the entrance of the China Lake Base.

54.     The Tribe and the City of Ridgecrest have entered into a Municipal Services Agreement anticipating the Tribally-owned gaming facility on this site, whereby the City of Ridgecrest committed to supporting Tribal Plaintiff's fee to trust application.

55.     The Homeland Act provides that an alternative parcel acquired by the Secretary pursuant to Section 5(d)(2) of the Homeland Act would be considered part of the Tribe's initial reservation for purposes of the IGRA. The Secretary has made a determination that the Ridgecrest Parcel is eligible for gaming under the IGRA. MOA § 6; Letter from Department of Interior to Niels Holch, Oct. 18, 2018 (attached hereto as Exhibit B).

56.     The Homeland Act contemplates that the Ridgecrest Parcel will be acquired, and paid for, by the United States. The Tribe has facilitated an easier and more expeditious acquisition by not requesting that the United States fund the purchase of the Ridgecrest Parcel, which ultimately could slow the process down – DOI would need to allocate money from its own budget or specifically appropriate it. Instead, the Tribe's gaming developer acquired an option for the purchase of the Parcel (which was set to expire in October 2018). The Developer will sign the Ridgecrest Parcel over to the Department for one dollar.

57.     On September 20, 2016, the Tribe officially requested that the Secretary enter into an MOA to mutually agree to acquire the Ridgecrest Parcel. This request categorized the

acquisition as discretionary. Memorandum in Support of Timbisha Shoshone Tribe Request to Secretary of Interior for an MOA to Mutually Agree to Acquire the Ridgecrest Parcel in Trust for the Tribe Pursuant to Section 5(d)(2) of the Timbisha Homeland Act (Attached hereto as Exhibit C).

58.     On or about December, 2016, the Tribe discussed the fee to trust acquisition with the Department of the Interior. At this time, the Department indicated that the Ridgecrest parcel acquisition was considered mandatory pursuant to the Homeland Act.

59.     On information and belief, the Department Office of the Solicitor issued a memorandum finding that the acquisition of the Ridgecrest parcel was a mandatory acquisition and that in its opinion the acquisition was authorized under the Homeland Act. While this is a privileged and confidential legal opinion, Tribal Plaintiff is informed and believes the Department could not move forward with a mandatory acquisition without the Solicitor's concurring opinion.

60.     On January 11, 2017, the Tribe submitted an Addendum (attached hereto as Exhibit D) to the September request changing the acquisition designation from discretionary to mandatory. The Addendum illustrates that the Secretary's decision to acquire land from a willing seller is discretionary but once the decision has been made, the Secretary has a mandatory duty to complete the acquisition.

61.     On January 17, 2017, the Tribe and the Secretary entered into the MOA with the Secretary pursuant to section 5(2)(d) of the Act, setting in motion the procedures for the acquisition of the parcel. Exhibit A. The MOA confirms that the acquisition is mandatory and commits the Department to purchase the Ridgecrest parcel from a willing seller for the sum of one dollar, upon three conditions: (1) the submission by the Tribe of a written request for

13

mandatory acquisition; (2) compliance with environmental due diligence; and (3) submission of title evidence. Exhibit A at pg. 3 ¶ 4. All three of these conditions have been met.

62.     After clearing the title to the Ridgecrest parcel as required for the mandatory acquisition, *see* United States Department of Justice, Regulations of the Attorney General Governing the Review and Approval of Title for Federal Land Acquisitions (2016), *available at* https://www.justice.gov/enrd/page/file/922431/download, the Tribe submitted the fee to trust application for the Ridgecrest parcel on September 7, 2017 to the BIA Pacific Regional Office. With this application, the Tribe presented the land purchase option. The BIA Pacific Regional Office staff and Regional Solicitor reviewed the application and approved it as a mandatory acquisition, then submitted it to the BIA Pacific Regional Director.

63.     The BIA Pacific Regional Director approved the application as a mandatory acquisition and forwarded it to the Department of the Interior for review.

64.     Upon information and belief, the DOI Office Indian Gaming, the DOI Office of the Solicitor (for the second time), and the Assistant Secretary for Indian Affairs all reviewed and approved the application as a mandatory acquisition.

65.     Under current Department policy, final decisions on off-reservation fee to trust acquisitions are made by James Cason, Associate Deputy Secretary. The Tribe's fee to trust acquisition is not strictly off-reservation given that under the terms of the Homeland Act the acquisition is considered part of the Tribe's initial reservation. Nevertheless, the Tribe met with Associate Deputy Secretary Cason on April 4, 2018, and August 9, 2018, and on both occasions the Associate Deputy Secretary confirmed that the Department considered the fee to trust acquisition to be a mandatory acquisition under the terms of both the Homeland Act and the MOA between the Tribe and the Secretary.

66.     Upon information and belief, the Assistant Secretary for Indian Affairs approved the application in early October 2018, in time to complete the acquisition before the land purchase option expired.

67.     On or about October 5, 2018, the Tribe contacted James Cason's office to inquire whether the Department had any outstanding concerns about the acquisition. The Associate Deputy Secretary informed the Tribe's representative that there were no outstanding questions or concerns about the application. The Associate Deputy Secretary noted that the only remaining delay was based on political considerations that are not grounded in statute or Department regulation. Specifically, the Associate Deputy Secretary said that he did not plan to approve the application until he heard from Congressman Kevin McCarthy representing the 23rd Congressional district. The Associate Deputy Secretary told the Tribe's representative that he did not need Congressman McCarthy to say that he supported the proposed fee to trust acquisition of the Ridgecrest parcel, but to at least indicate that he did not oppose it, or that he had no position on it.

68.     The Associate Deputy Secretary had numerous conversations with the Tribe's representative throughout the month of October, 2018, and continuing until the present, and the Associate Deputy Secretary consistently indicated that Congressman McCarthy's office had not returned his calls and that the Associate Deputy Secretary would not act on the Tribe's mandatory fee to trust acquisition until he heard from Congressman McCarthy's office. The Associate Deputy Secretary did not offer any other conditions for approval, nor did the office indicate a timeline on which the Department plans to act.

69.     The Tribal Chairman sent letters to Associate Deputy Secretary Cason and Congressman McCarthy on November 19, 2018, and each was copied on the letter to the other.

In these letters the Tribe communicated that it had the opportunity to request an extension of the option period during the City Council's lame duck period (before the new City Council was seated) and stated bluntly its understanding that the only reason the fee to trust had not been approved was the lack of response from Congressman McCarthy's office. Neither letter elicited a response from the Department or the Congressman.

70.     Tribal representatives met with Associate Deputy Secretary Cason on December 6, 2018. At the meeting the Associate Deputy Secretary did not offer any explanation for his failure to approve the fee to trust other than the lack of response from Congressman McCarthy. The Associate Deputy Secretary asked the Tribe at the meeting whether the Ridgecrest fee to trust was still viable. At this time both deadlines the Tribe had conveyed to the Department had expired: the end of the option period and the end of the lame duck period for the City Council. The Tribe answered the Associate Deputy Secretary that the Tribe still had avenues for acquiring the land. The Associate Deputy Secretary accepted the Tribe's response without asking for details. The Associate Deputy Secretary and the Tribe discussed potential alternative BLM sites located near the City, but the Department was unable to answer basic questions about what that process would look like. The Associate Deputy Secretary tasked one of the Department's attorneys, Kyle Scherer, with following up with the Tribe to answer those questions.  Subsequent calls and emails to Deputy Solicitor Scherer went unanswered.

71.     While the October 2018 purchase option has expired, the property's former owner has a right to force the sale based on the provisions of its contract with the Ridgecrest Redevelopment Agency. China Lake Properties, a California partnership (CLP), CLP holds an interest in the Ridgecrest parcel. CLP sold the Ridgecrest parcel to the City of Ridgecrest Redevelopment Agency in 2000, but kept both a lien on it and certain contractual rights to force

the sale of the Ridgecrest parcel if the Redevelopment Agency had not resold or leased it within 10 years. CLP is prepared to exercise its contractual rights to finalize the sale of the Ridgecrest parcel to Global Investment Enterprise Ridgecrest, LLC (GIER). GIER will transfer the Ridgecrest parcel to the United States Government to be held in trust for the Timbisha Shoshone Tribe. Under the terms of the Municipal Services Agreement, the City of Ridgecrest has an obligation to support this sale and the fee to trust acquisition.

72.     GIER negotiated a letter of intent with CLP indicating that CLP will exercise it contractual right to force the City to sell the land to GIER if the Department makes the decision to accept the land into trust. In order to clarify any misunderstanding informally conveyed by the Deputy Assistant Secretary for Indian Affairs, the letter of intent and a cover letter were sent to the Associate Deputy Secretary on March 8, 2019.

73.     This is not the first time the Department of the Interior has been accused of allowing improper political communications to influence its decisions regarding Native American tribes. In a similar case, the state of Connecticut and the Mashantucket Pequot Tribe filed a lawsuit alleging that the Secretary of the Interior had unlawfully declined to approve an agreement that would allow them to begin construction of a casino. In February 2019, this Court held that the Mashantucket Pequot Tribe had adequately alleged a claim against the Department of the Interior for undue political influence. *State of Connecticut v. U.S. Dept. of the Interior*, No. 17-02564 (D.D.C. Feb. 15, 2019). One month after this Court's ruling, the Department of Interior settled the matter and allowed the casino project to move forward. The Department of Interior is still under investigation by the Office of Inspector General to determine whether the Department is allowing political influence to interfere with its longstanding trust duties to Native American tribes.

17

74.     Defendants' delay is significantly prejudicing and harming the Tribal Plaintiff. For decades, the Tribe has worked with the Department to establish a land base that will provide the Tribe with housing, government and administrative facilities, and economic development. Economic development is necessary to promote Tribal health and welfare, to fund social and medical services, to create jobs, and to re-establish a Tribal epicenter. The Tribe is unable to engage in meaningful economic development without a reservation upon which to do so.

## INJUNCTIVE RELIEF ALLEGATIONS

75.     Tribal Plaintiff incorporates all of the allegations of the paragraphs above as though fully set forth in this paragraph.

76.     If an injunction does not issue, Defendants' continued delay and failure to act will result in irreparable harm to Tribal Plaintiff and its individual members in the manner described herein, in violation of federal law and contrary to the public interest.  Unless the relief requested is granted, Tribal Plaintiff and its citizens will be further deprived of their rights to a land base and economic development. No monetary damages or other legal remedy could adequately compensate Tribal Plaintiff, or its citizenry, for this harm.

77.     Tribal Plaintiff has no plain, speedy, or adequate remedy at law.

78.     Accordingly, injunctive relief is appropriate.

## DECLARATORY RELIEF ALLEGATIONS

79.     Tribal Plaintiff incorporates all of the allegations of the paragraphs above as though fully set forth in this paragraph.

80.     An actual and substantial controversy presently exists between Tribal Plaintiff and the federal Defendants. Tribal Plaintiff asserts that the Department's failure to act violates federal law, the MOA, and the APA.

81.     This case is presently justiciable because Defendants' failure to comply with these laws has caused and will continue to cause immediate and concrete injury to Tribal Plaintiff and its citizens.  Tribal Plaintiff and its members are persons adversely affected or aggrieved by the failure to take federal agency action described herein and are entitled to judicial review of such action within the meaning of section 702 of the APA. Tribal Plaintiff's interests are directly and significantly harmed by the federal Defendants' illegal failure to act, and the relief requested will fully redress those injuries.

82.     Declaratory relief is, therefore appropriate to resolve this controversy.

**FIRST CLAIM FOR RELIEF**
**(Violation of the APA: Failure to Complete the Mandatory Acquisition of the Ridgecrest Parcel Constitutes Agency Action Unreasonably Delayed)**

83.     Tribal Plaintiff incorporates all of the allegations of the paragraphs above as though fully set forth in this paragraph.

84.     The Timbisha Shoshone Homeland Act requires the Secretary of the Interior to acquire the Ridgecrest Parcel as described in detail above. The Secretary assumed this mandatory duty to take the Ridgecrest parcel into trust for the Tribe in the MOA. This acquisition is a discrete and mandatory agency action.

85.     The Secretary's failure to complete said discrete and mandatory acquisition within a reasonable time constitutes an unreasonably delayed agency action within the meaning of APA, 5 U.S.C. § 555(b).

86.     The APA grants a right of judicial review to a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." *Id*. at § 702.

87.     The definition of "agency action" includes a "failure to act." *Id*. at § 551(13).

88. Tribal Plaintiff and its members are adversely affected by the Secretary's failure to complete the mandatory acquisition of the Ridgecrest Parcel.

89. The APA states that a reviewing court "shall" interpret statutes and "compel agency action unlawfully withheld or unreasonably delayed." *Id*. at § 706(1).

90. The Secretary's failure to compete the Ridgecrest Parcel acquisition constitutes unreasonably delayed agency action that this Court shall compel. See *id*.

**SECOND CLAIM FOR RELIEF**
**(Violation of the APA: Failure to Complete the Mandatory Acquisition of the Ridgecrest Parcel Constitutes Is an Abdication of Its Clear Statutory Responsibility)**

91. Tribal Plaintiff incorporates all of the allegations of the paragraphs above as though fully set forth in this paragraph.

92. The Homeland Act provides discretion for the Secretary to make the decision as to whether to purchase the two privately-owned parcels for the Tribe. Congresses use of the word "may" illustrates its intent that the Secretary use its discretion in making this decision.

93. It is also within the discretion of the Secretary and the Tribe to "mutually agree" upon another parcel in place of Lida Ranch. The Secretary and the Tribe can exercise their independent discretion to agree on an alternate parcel.

94. The discretionary aspect of the decision ends after that step.

95. The language "to be taken into trust for the Tribe" is not qualified by the word "may." It is a mandatory directive. Once the Secretary agrees to take the alternate parcel into trust for the Tribe, it must complete the acquisition. The Secretary agreed to take the Ridgecrest Parcel into trust in the MOA.

96. The APA states that a reviewing court "shall" interpret statutes and "compel agency action unlawfully withheld or unreasonably delayed." *Id*. at § 706(1).

97.     "When recalcitrance in the face of a clear statutory duty is of such a magnitude that it amounts to an abdication of statutory responsibility, the court has the power to order the agency to act to carry out its substantive statutory mandates." *Sierra Club v. Thomas*, 828 F. 2d 783, 793 (D.C. Cir. 1997).

98.     Under the APA, courts "shall … hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).

99.     The Secretary's failure to act is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, and an abdication of its mandatory duty under the Timbisha Shoshone Homeland Act.

**THIRD CLAIM FOR RELIEF**
**(Violation of the APA: Failure to Complete the Mandatory Acquisition of the Ridgecrest Parcel Is Arbitrary and Capricious)**

100.    Tribal Plaintiff incorporates all of the allegations of the paragraphs above as though fully set forth in this paragraph.

101.    Defendants' delay in completing the mandatory acquisition of the Ridgecrest Parcel is based entirely on improper and undue political considerations. Absent these improper and undue political considerations, Defendant Cason, by his office's own admission, would have approved the mandatory acquisition.

102.    Under the APA, courts "shall … hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). An agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its

decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Assoc. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

103.    Because Defendants' failure to act was motivated in whole, or in part, by conditioning Defendants' decision on improper and undue political considerations which Congress has not intended it to consider, Defendants' actions were arbitrary, capricious, an abuse of discretion, and not in accordance with the law.

## REQUESTS FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

(a)    Declare that the Defendants have violated the APA by failing to complete the Ridgecrest Parcel Acquisition within a reasonable time;

(b)    Declare that Defendants have violated the APA by failing to approve the mandatory Ridgecrest Parcel Acquisition;

(c)    Order the Defendants to respond to the Ridgecrest Parcel Acquisition;

(d)    Order the Defendants to approve the Ridgecrest Parcel Acquisition;

(e)    Retain jurisdiction over this case to ensure compliance with its decree;

(f)    Award Tribal Plaintiff attorney fees and all other reasonable expenses incurred in pursuit of this action pursuant to 28 U.S.C. § 2412 or otherwise;

(g)    Grant all other relief as the Court deems just and proper.

Respectfully submitted this 16th day of May, 2019.

_____

Paige M. Tomaselli (Bar ID CA 237737)
Mark A. Levitan (CA SBN 186990)
LEVITANLAW
P.O. Box 5475
Sonora, CA 95370
Email: paige@levitanlaw.net
       mark@levitanlaw.net
Phone: (619) 339-3180
Attorneys for Tribal Plaintiff

# EXHIBIT A

# MEMORANDUM OF AGREEMENT

### between

## THE U.S. DEPARTMENT OF THE INTERIOR

### and the

## DEATH VALLEY TIMBI-SHA SHOSHONE TRIBE

**WHEREAS,** since time immemorial, the Death Valley Timbi-sha Shoshone Tribe, also known as the Timbi-sha Shoshone Tribe (Tribe) has lived within an ancestral homeland encompassing portions of California and Nevada and including the area that now comprises Death Valley National Park and lands now administered by the Bureau of Land Management; and

**WHEREAS,** though the Tribe achieved Federal recognition in 1983 through the Federal acknowledgment process at 25 C.F.R. Part 83, it lacked a land base within the Tribe's ancestral homeland; and

**WHEREAS,** recognizing the growth in the Tribe's membership and their desire and need for housing, government and administrative facilities, cultural facilities, and sustainable economic development to provide decent, safe, and healthy conditions for themselves and their families, Congress enacted the Timbisha Shoshone Homeland Act, Pub. L. No. 106-423, 114 Stat. 1875 (the Act) in 2000; and

**WHEREAS,** Congress intended for the Act to provide the Tribe with a land base on which the Tribe could live permanently and govern the Tribe's affairs in a modern community and pursue economic development, including through gaming under the Indian Gaming Regulatory Act, 25 U.S.C. § 2701, *et seq.* (IGRA); and

**WHEREAS,** Section 5(a) of the Act mandated the acquisition in trust for the benefit of the Tribe of five non-contiguous parcels of Federal land located in and around Death Valley National Park while Section 5(d) additionally mandated the trust acquisition of two privately owned parcels of land with appurtenant water rights known as the Indian Rancheria Site, California and the Lida Ranch, Nevada, should the Department decide to purchase the parcels from willing sellers; and

**WHEREAS,** Section 5(d)(2) of the Act authorizes the Secretary and the Tribe to mutually agree upon a substitute parcel in lieu of the Lida Ranch, Nevada to be acquired in trust for the Tribe; and

**WHEREAS,** Section 7(c) of the Act provides that lands taken into trust for the Tribe's benefit pursuant to Section 5(d)(2) shall be considered to be the Tribe's "initial reservation" for purposes of Section 20(b)(1)(B)(ii) of IGRA; and

Page 1 of 4

**WHEREAS,** Section 7(c) of the Act limits the Tribe's ability to pursue economic development through IGRA to the former Bureau of Land Management (BLM) lands described in Section 5(b)(B)-(E) and to either the Lida Ranch, Nevada or another, mutually agreed upon parcel in lieu of the Lida Ranch as described in Section 5(d)(2); and

**WHEREAS,** the Act contains no geographic restrictions for selecting a substitute parcel in lieu of the Lida Ranch, Nevada; and

**WHEREAS,** the remote geographic location of the former BLM lands provided to the Tribe by Section 5(b)(B)-(E) of the Act limits the forms of economic development that are viable, including Indian gaming; and

**WHEREAS,** the owners of the additional lands described in Section 5(d) of the Act have not been willing to sell the lands; and

**WHEREAS,** the Tribe has identified an approximately 26.48-acre parcel of land in Ridgecrest, California (Ridgecrest Parcel) less than five miles from or within the Tribe's ancestral homelands that could provide the Tribe with a valuable and sustainable economic development opportunity through operation of a gaming facility under IGRA; and

**WHEREAS,** since passage of the Act, the Secretary and the Tribe have taken no steps to implement Section 5(d)(2) of the Act or mutually agree upon a substitute parcel in lieu of the Lida Ranch, Nevada; and

**WHEREAS,** the Tribe now seeks the Secretary's agreement to the Ridgecrest Parcel as a substitute in lieu of the Lida Ranch, Nevada for purposes of Section 5(d)(2) of the Act.

**NOW, WHEREFORE,** the Secretary and the Tribe enter into this Memorandum of Agreement ("MOA") to set forth the following procedures for implementing Section 5(d)(2) of the Act:

1. <u>Authority</u>.  The Secretary acknowledges that though the Timbisha Shoshone Homeland Act contains no provisions delimiting the location of a substitute parcel in lieu of the Lida Ranch, Nevada, the Act and its legislative history may be interpreted as permitting lands lying within or near the Tribe's ancestral homelands having the potential for economic development to be considered for substitution.

2. <u>Location</u>.  Based on anthropological evidence supported by findings of the Indian Claims Commission, the Secretary finds that the Ridgecrest Parcel and its surrounds have historical connections to the Little Lake Band of the Timbisha Shoshone, lying either within or adjacent to the Band's historic linguistic and socio-cultural area.

3. <u>Substitution</u>. The parties agree that the Ridgecrest Parcel shall be substituted for the Lida Ranch, Nevada for purposes of Section 5(d)(2) of the Act, subject to the conditions in Section 4below.

4. <u>Purchase</u>.

   a. Pursuant to the authority of Section 5(d)(2) of the Act, the Secretary hereby agrees to purchase the Ridgecrest Parcel from a willing seller for the sum of one dollar ($1.00) upon the following:

      i. The submission by the Tribe of a written request for mandatory acquisition of the Ridgecrest Parcel pursuant to the requirements set forth in Section 3.1.3 of the Bureau of Indian Affairs *Fee-to-Trust Handbook* (2016);

      ii. Compliance with the environmental due diligence requirements of 602 DM 2; and

      iii. The submission by the Tribe of title evidence meeting the requirements of the U.S. Department of Justice, *Regulations of the Attorney General Governing the Review and Approval of Title for Federal Land Acquisitions* (2016).

   b. The Secretary reserves the right to decline to purchase the Ridgecrest Parcel in lieu of the Lida Ranch, Nevada in the event the Ridgecrest Parcel does not conform to the standards referred to in subsection (a) above. Such declination shall render this MOA null and void.

5. <u>Conveyance</u>. Upon purchase of the Ridgecrest Parcel by the Secretary from the Tribe pursuant to Paragraph 4 above, the Secretary shall accept the conveyance of title to the Ridgecrest Parcel and appurtenant water rights in trust for the Tribe in accordance with Section 3.1.3 of the Department's *Fee-to-Trust Handbook*.

6. <u>Initial Reservation</u>. In accordance with Section 7(c) of the Act, after being taken into trust for the benefit of the Tribe the Ridgecrest Parcel shall be considered as the Tribe's "initial reservation" for purposes of Section 20(b)(1)(B)(ii) of IGRA.

7. <u>Exhaustion of Mandate</u>. Trust acquisition of the Ridgecrest Parcel shall fulfill the Secretary's responsibilities under Section 5(d)(2) of the Act and no further lands shall be acquired pursuant thereto.

8. <u>Term of Agreement</u>. The withdrawal by the Tribe of its request to substitute the Ridgecrest Parcel for the Lida Ranch, Nevada for purposes of Section 5(d)(2) of the Act shall render this MOA null and void.

SECRETARY OF THE INTERIOR

By: _____        Date: ___1/19/17___

Lawrence Roberts, Principal Deputy
Assistant, Secretary – Indian Affairs

TIMBISHA SHOSHONE TRIBE

By: _____        Date: ___1/19/2017___

George Gholson, Chairman

By: _____        Date: ___01/19/2017___

Eleanor Jackson, Secretary/Treasurer

TIMBISHA MOU                                        Page 4 of 4

# EXHIBIT B



# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, DC 20240

OCT 12 2018

Mr. Niels Holch, Esq.
Holch & Erickson LLP
400 North Capital Street, NW.
Suite 585
Washington, D.C. 20001

Dear Mr. Holch:

Thank you for your letters dated February 4, 2018, and April 3, 2018, in which you requested that the Department of the Interior (Department) review, reconsider, and withdraw from the Memorandum of Agreement (MOA) with the Death Valley Timbi-sha Shoshone Tribe (Tribe) dated January 19, 2017. Your comments have been included in the record. Additionally, the letters dated July 24, 2016, and March 17, 2017, from your clients Ricky Fielding and Michael Neel, which contain a similar request, have been included in the record. Among the issues raised in your and your clients' letters is a concern that the MOA circumvents local governments' participation in the Department's trust acquisition process. Further, you and your clients question the potential for local citizen and government input into the Tribe's planned use of the Ridgecrest property.

After careful consideration and review of the Tribe's request and the Timbisha Shoshone Homeland Act of 2000[1] (Homeland Act), the Department entered into the MOA with the Tribe to address the process by which the Tribe and the Department would mutually agree on a substitute parcel as authorized by Section 5(d)(2) of the Homeland Act. The MOA establishes how the Department would process the Tribe's application for trust acquisition of the Ridgecrest property.

The Tribe has taken steps to involve local governments. Due to the Tribe's actions, the City of Ridgecrest (City), which has jurisdiction over the Ridgecrest property, has been, and remains, involved in the Department's trust acquisition process. Further, the City was instrumental in the selection of the Ridgecrest property, which it owns. The City Council voted to support the Tribe's efforts on June 1, 2016, and again on March 21, 2018. In June 2016, the City and the Tribe entered into a Municipal Services Agreement (MSA) to facilitate the development of a gaming facility at the Ridgecrest property. The MSA provides for the provision of municipal services to the City and its residents, and provides for an ongoing cooperative relationship between the City and the Tribe. It addresses a number of potential impacts to the City and its residents, and provides for an ongoing cooperative relationship between the City and the Tribe. Additionally, the Tribe has initiated a Tribal Environmental Impact Report and has invited the City and Kern County to participate in the process. Therefore, while the Department is not required to engage in analysis under the National Environmental Policy Act because the Homeland Act mandates acquisition of land for the Tribe, the Tribe has consistently involved local governments in the environmental review process and the application process.

---

[1] Pub. L. No. 106-423, 114 Stat. 1875 (2000).

The Department's interpretation of the Homeland Act and our position on the MOA remain unchanged. The Department will not withdraw from the agreement with the Tribe and will continue processing the Tribe's application for trust acquisition of the Ridgecrest property in accordance with the Homeland Act and the MOA.

If you have any further questions or comments, you may contact Ms. Paula Hart, Director, Office of Indian Gaming, at (202) 219-4066.

Sincerely,

John Tahsuda
Principal Deputy Assistant Secretary – Indian Affairs

# EXHIBIT C

# Memorandum in Support of the
# Timbisha Shoshone Tribe Request to the Secretary of the Interior
# for an MOA to Mutually Agree to Acquire
# the Ridgecrest Parcel in Trust for the Tribe
# Pursuant to Section 5(d)(2) of the Timbisha Homeland Act

**For FOIA Purposes this is a Voluntary Submission of Financial/Commercial
Confidential Information on Behalf of the Tribe**

## 1. <u>Introduction</u>

The Timbisha Shoshone Tribe (the "Tribe") is a federally recognized sovereign nation.[1]  The Tribe's ancestral homeland includes the area that now comprises Death Valley National Park and neighboring areas of California and Nevada.  The Tribe was officially re-recognized by the United States in 1983.[2]  The Tribe remained landless until Congress passed the Timbisha Homeland Act in 2000 (the "Act").[3]  The Act identified five non-contiguous parcels to be held in trust for the benefit of the Tribe and to serve as the Tribe's initial reservation.  The Act also authorizes the Secretary of the Interior to acquire on behalf of the Tribe two specifically identified parcels from willing sellers, to be placed in trust for the Tribe and considered part of the Tribe's initial reservation.[4]  In the place of the second parcel, the Act provides that, in the alternative, the Secretary may acquire "another parcel mutually agreed upon by the Secretary and the Tribe."[5]

Sixteen years has passed since the Act was adopted, but the Tribe is still awaiting the full implementation of the Act.  The Tribe requests the Secretary to enter into a Memorandum of Agreement ("MOA") with the Tribe to acquire an alternative parcel in Ridgecrest, California (the "Ridgecrest parcel")[6] by mutual agreement between the Secretary and the Tribe pursuant to Section 5(d)(2) of the Act.

The Act provides that the Secretary "may" acquire the additional parcel,[7] therefore it is a discretionary acquisition, not a mandatory acquisition, and the Tribe will be required to complete the fee to trust process provided for at 25 C.F.R. Part 151.  The Tribe requests the MOA before

---

[1] 80 F.R. 1942, January 14, 2015 (Indian Entities Recognized and Deemed Eligible To Receive Services From The United States Bureau of Indian Affairs).  The Tribe is listed under the name "Death Valley Timbi-Sha Shoshone Tribe."

[2] Memorandum from Deputy Assistant Secretary-Indian Affairs to Assistant Secretary-Indian Affairs, February 9, 1982, *Recommendation and summary of evidence for proposed findings for Federal acknowledgement of Death Valley Timbi-Sha Shoshone Band of Indians of California pursuant to 24 C.F.R. 54* ("Federal Acknowledgement"). Exh. B.

[3] The Timbisha Shoshone Homeland Act. 16 U.S.C. § 104aa, Pub. L. 106-423, §§ 1-8, Nov. 1, 2000, 114 Stat. 1875. Exh. A.

[4] The Act. Section 5(d)(1) and (2). Exh. A.

[5] The Act. Section 5(d)(2). Exh. A.

[6] See Purchase and Sale Agreement dated September 7, 2016.  Exh. C.  This Agreement has been approved by the Tribe and the City of Ridgecrest but a fully executed version is not yet available.

[7] The Act. Section 5(d). Exh. A.

the fee to trust because that process is both time consuming and expensive and the Tribe should not be unduly burdened in its efforts to seek full implementation of the Timbisha Homeland Act.

The Tribe plans to utilize the Ridgecrest parcel for gaming purposes.  The Act provides that an alternative parcel acquired by the Secretary pursuant to Section 5(d)(2) of the Act would be considered part of the Tribe's initial reservation for purposes of the Indian Gaming Regulatory Act ("IGRA").[8]  The Tribe acknowledges that by agreeing to a discretionary acquisition of the parcel for the Tribe pursuant to the Act, the Secretary is in effect making a determination that the Ridgecrest parcel is eligible for gaming as part of the Tribe's initial reservation pursuant to IGRA, Section 20(b)(1)(B)(ii).  While 25 C.F.R. Part 292 does not govern this action due to the independent authority granted to the Secretary pursuant to the Timbisha Homeland Act, the Tribe acknowledges that the policy considerations of Part 292 will be relevant for the Secretary in making this "mutual agreement" decision with the Tribe.  This submission will set forth the history of the Tribe, the Timbisha Homeland Act and its purposes and effect, the Tribe's need for the additional land, the Tribe's need for gaming, and how the acquisition satisfies the policy considerations of Part 292.6 for initial reservations.

Although the Act contemplates that the Ridgecrest parcel will be acquired (and paid for) by the United States,[9] the Tribe hopes to make the acquisition easier and more expeditious for the Secretary by not requesting that the United States make a meaningful financial contribution towards the purchase of the parcel.  The Tribe's gaming developer has acquired an option for the purchase of the parcel.[10]  Upon the approval of the MOA and the fee to trust, the developer will sign the Ridgecrest parcel over to the BIA at no cost or, if the Secretary finds that it is necessary to pay for the parcel in order to comply with the Act, the United States may purchase the parcel from the Tribe's developer for a nominal price.

## 2.  History of the Tribe

The Timbisha Shoshone Tribe are the descendants of a subgroup of the Shoshone people who have occupied the desert area in and around Death Valley National Park, and extending to the eastern base of the Sierra Nevada Range, since time immemorial.  In the anthropological record they are often referred to as the Panamint Shoshone or the Koso Shoshone.  The early anthropological analysis of the Panamint Shoshone was conducted by Julian Steward and

---

[8] The Act. Section 7(c). "Lands taken into trust for the Tribe pursuant to section 5, except for the Park land described in subsections b(1)(A) and d(1) of such section shall be considered to be the Tribe's initial reservation for purposes of section 20(b)(1)(B)(ii) of the Indian Gaming Regulatory Act (25 U.S.C. 2719(b)(1)(B)(ii))." Exh. A. Note that the Park land referenced at (b)(1)(A) is the Furnace Creek parcel, and the Park land referenced at (d)(1) is the privately owned Indian Rancheria parcel.

[9] The Act, Section 5(d): "Additional Trust Resources.  The Secretary may *purchase* from willing sellers the following parcels…" (emphasis added). Exh. A.

[10] Purchase and Sale Agreement.  Exh. C.  Note that the Tribe has entered into a Management Agreement and a Development Agreement with Ridgecrest Global Investment Enterprise, LLC.  The General Council of the Tribe recently approved the limited waiver of immunity contained in these agreements, and the Tribe will be submitting them to the National Indian Gaming Commission in the near future.

published in 1930s.  The Chairman of the Tribe can recall his grandparents telling the story of when Julian Steward stayed with them.[11]

To assist with preparations for this request pursuant to the Timbisha Homeland Act, the Tribe acquired the assistance of anthropologists from the University of Utah who specialize in tribes from the Great Basin area.[12]  The Codding Report finds that Steward identified four "districts" of the Panamint Shoshone: Little Lake, Saline Valley, Panamint Valley, and Death Valley.[13]  The highest population of the Panamint Shoshone was in the Little Lake Band area.[14]

Through non-native encroachment, the Tribe's use of its territory shrank over time.  The Tribe came under the supervision of the Bureau of Indian Affairs at least as early as 1911, when Tribal children began attending board school.[15]  Several members received public domain allotments during the allotment era.[16]  In 1928 a single family of the Tribe, the Hansons, received a reservation in Panamint Valley.[17]  This reservation became known as Indian Rancheria, and it is specifically identified in the Act as land the Secretary can acquire from willing sellers.[18]  Despite requests from government agents, other parcels that were suggested for federal designation for Timbisha members were not approved by Congress.[19]

The remainder of the Tribe were considered by the BIA to be non-ward Indians but the BIA provided them a variety of services.[20]  In 1937 the BIA assisted the Tribe in forming a Tribal Council.[21]  Efforts to provide the Tribe with a reservation were stymied by establishment of the Death Valley National Monument in 1933, which made ineligible a significant portion of the Tribe's territory.[22]  An interagency agreement provided a 40 acre parcel for the Tribe's use within the Monument for a village site (the "Village"), which has been occupied by Tribal members since.[23]  The residents of the Village played a critical role in maintaining a cultural and political center for the Tribe, which formed much of the basis for the BIA's decision to re-recognize the Tribe in 1983.[24]

---

[11] Gholson Declaration.  Exh. D.
[12] *Evaluating the Extent of the Timbisha Shoshone Homeland*, report prepared for the Timbisha Shoshone Tribe by Ashley K. Parker and Brian F. Codding, The University of Utah (July 25, 2016) (the "Codding Report"). Exh. E.
[13] Codding Report, Pg. 14. Exh. E.
[14] Codding Report, Pg. 14. Exh. E.
[15] Federal Acknowledgement, Pg. 3. Exh. B.
[16] Federal Acknowledgement, Pg. 3.  Exh. B. Codding Report, Pg. 20, and the locations of some of the allotments are identified on Figure 3, Pg. 23. Exh. E.
[17] Federal Acknowledgement, Pg. 3.  Exh. B. Codding Report, Pg. 21, and the location of the Hanson Indian Rancheria is identified on Figure 3, Pg. 23. Exh. E.
[18] The Act, Section 5(d)(1).  Exh. A. The Indian Rancheria reservation was terminated in 1964. Federal Acknowledgement, Pg. 36 of 68. Exh. B.
[19] Codding Report, Pg. 21. Exh. E.
[20] Federal Acknowledgement. Pg. 3. Exh. B.
[21] Federal Acknowledgement, Pg. 3. Exh. B.
[22] Federal Acknowledgement, Pg. 3. Exh. B.
[23] Federal Acknowledgement, Pg. 3. Exh. B.
[24] Federal Acknowledgement, Pg. 5. Exh. B.

In its recommendation for recognition in 1982, the BIA acknowledged that the Timbisha Shoshone Tribe "…is clearly derived from several traditional Western Shoshone political units located in Death Valley and neighboring mountain ranges.  These units, made up of several family groups each, were traditionally linked by economic and kinship relationships."[25]  Because of the location of the Village site and the gathering of many members there during the 1920s and 1930s,[26] the Tribe came to be associated primarily with Death Valley and Furnace Creek,[27] but all four bands of the Tribe were still in existence and recognized as distinct family groups within the Tribe.  The descendants of the four bands all trace their lineage back to the Census reports of 1933 and 1936 Census which are referenced in the Tribe's Federal Acknowledgement.[28]

Within the Little Lake Band area were the Coso Hot Springs, which were sacred to the Timbisha and other neighboring groups.  Although the hot springs were completely within the Timbisha territory, they permitted other tribes such as the Kawaiisu, Paiute, and Tubatulabal to use the sacred area.[29]  The Little Lake Band suffered further displacement because most of the Band's territory was taken over by the Naval Air Weapons Station China Lake ("China Lake Base") in 1943.  Little Lake Band members residing at Indian Gardens, Coso Hot Springs, and in the Coso Range and the Argus Range were all forcibly removed from their homes at that time.[30]

Congress adopted the Desert Protection Act in 1994, and required a report to be prepared on how to best address the Timbisha Shoshone Tribe's land needs.  After several years of delay on the part of the United States, the Secretary put together a working group including the Tribe and the recommendation of the Timbisha Shoshone Homeland Act was the result of that work.

### 3.   The Timbisha Shoshone Homeland Act

The Timbisha Shoshone Homeland Act is clearly an effort to balance the interests of the Tribe in acquiring sufficient lands to constitute a reservation and the interests of the United States in keeping the Death Valley National Park as intact as possible.  In addition, the National Park Service was interested in ensuring that the Tribe's presence within the Park was consistent with the Park's perspective on what belongs in a National Park and what does not.

To that end, the Act provides for five non-contiguous parcels to be held in trust for the benefit of the Tribe.[31]  All five of these parcels were already owned by the United States, but the Act changed their designation to lands held in trust for the Tribe and therefore under the supervision of the BIA.  Four of the parcels were outside the boundaries of the Park under BLM management.  One of the parcels was located inside the boundaries of the Park, encompassing the Village plus additional adjacent lands that were under Park management.

---

[25] Federal Acknowledgement, Pg. 4. Exh. B.
[26] Federal Acknowledgement, Pg. 13. Exh. B.
[27] Codding Report, Pg. 11. Exh. E.
[28] Federal Acknowledgement, Pg. 15. Exh. B.
[29] Codding Report, Pg. 16. Exh. E.
[30] Codding Report, Pg. 25. Exh. E.  Picture of Little Lake Band descendants visiting ancestral home within the Naval Air Weapons Station China Lake. Exh. F.
[31] The Act, Section 5(b). Exh. A.

a. **Trust Parcels**

    (i)    *Furnace Creek*

The first parcel is 314 acres in Furnace Creek, California, within the Death Valley National Park.[32]  Furnace Creek is the only reservation parcel that has a residential population. Approximately twenty members live in the Village.  Of the five parcels, Furnace Creek is the only parcel that was subject to a considerable amount of planning for its use after passage of the Act.  The Act specifically provides that the Tribe may open a small to moderate size desert inn and cultural center at this site, and prohibits more than fifty single-family residences.[33]  The concerns of the Park with regard to maintaining uses that it deemed consistent with the Park's purpose are demonstrated by the care and attention the Act pays to the Furnace Creek parcel. The Park was apparently even concerned with ensuring that the Tribe's development at Furnace Creek would be unique enough not to compete with the existing accommodations at Furnace Creek.[34]  The Tribe is prohibited from gaming on the Furnace Creek parcel.[35]  The Tribe has not given up hope on developing an inn at Furnace Creek.  The Tribe has been diligently pursuing this project for the last five years, but to date has not been able to acquire financing.

    (ii)    *Death Valley Junction*

The second parcel is 1,000 acres at Death Valley Junction, California.[36]  Death Valley Junction is a very remote road intersection (Highways 190 and 127) on the route from Las Vegas to the Park.  The intended uses for Death Valley Junction were single family residences and small-scale economic development.[37]  The Tribe has had difficulty finding a use for the parcel. It is too remote for Tribal members to use for residences because there is no work or schools nearby.  The Tribe researched gas stations and convenient stores but the traffic numbers do not warrant these projects.  The Tribe undertook an alternative energy study and it was not economically feasible to develop the parcel for wind or solar power generation.  The Tribe was advised by experts that there is plenty of open desert land very close to Las Vegas available for alternative energy development, so it is not cost effective to invest in projects further away from the population center and incur the additional transmission line costs.

    (iii)    *Centennial*

The third parcel is 640 acres at Centennial, California.[38]  The intended uses for the Centennial parcel were single family residences and small-scale economic development.[39]  The water resources of Centennial had not been adequately researched at the time of the Act's

---

[32] The Act, Section 5(b)(1)(A). Exh. A.  See Map 1. Exh. G.
[33] The Act, Section 5(b)(3), Exh. A.
[34] Legislative Environmental Impact Statement of the Timbisha Homeland Act prepared by the National Park Service (the "LEIS"), Section 2.2.1.1.
[35] The Act, Section 7(c), Exh. A.
[36] The Act, Section 5(b)(1)(B).  Exh. A.  See Map 2. Exh. G.
[37] LEIS 2.2.2.1.
[38] The Act, Section 5(b)(1)(C)(i).  Exh. A. See Map 3. Exh. G.
[39] LEIS 2.2.2.1.

adoption, and the Act provided that if the Centennial parcel did not have adequate water then the Tribe would be able to exchange it for another parcel of approximately 640 acres administered by the BLM and located "in that portion of Inyo County, California, to the north and east of the China Lake Naval Weapons Center, to be a mutually agreeable substitute…."[40]  Studies conducted since 2000 have confirmed that Centennial lacks sufficient water, and the Tribe and the BLM are currently discussing alternative sites.  This exchange should not be confused with the Tribe's request in this submission.  The Tribe is working directly with the BLM on finding a suitable replacement for the Centennial parcel.  This request to the Secretary for a mutual agreement to acquire the Ridgecrest parcel is not related in any way to the Centennial parcel.

### (iv)    Scotty's Junction

The fourth parcel is 2,800 acres at Scotty's Junction, Nevada.[41]  Scotty's Junction is located at a remote intersection (Highways 95 and 267).  The intended uses for this parcel were single family residences and small-scale economic development.[42]  The Tribe has not been able to begin any development on the Scotty's Junction parcel.  It is too remote to develop for residential uses.  The Tribe considered alternative energy development but found the same results as at Death Valley Junction in an even more remote location.

### (v)    Lida Community

The fifth parcel is 3,000 acres at Lida, Nevada.[43]  The intended uses for this parcel were also single family residences and small-scale economic development.[44]  Lida is considered a ghost town and there are no economic opportunities nearby to support a population of members.  The Tribe considered alternative energy development but found the same results as at Death Valley Junction in an even more remote location.

### b.  Additional Parcels

### (vi)    Indian Rancheria

The first parcel identified in the Act for potential purchase from a willing seller is the Indian Rancheria site.[45]  The intended uses for this parcel were family residences and limited agriculture.[46]  The Indian Rancheria is land that was formerly held in trust for the Hansons, a single family of the Timbisha Shoshone.  The land passed out of trust when the Rancheria was terminated in 1964.[47]  The descendants of the Hansons still own the land.  The Tribe has contacted them and they are not interested in selling.[48]

---

[40] The Act, Section 5b(1)(C)(ii). Exh. A.

[41] The Act, Section 5b(1)(D). Exh. A. See Map 4. Exh. G.

[42] LEIS 2.2.2.1.

[43] The Act, Section 5(b)(1)(E).  Exh. A. See Map 5. Exh. G.

[44] LEIS 2.2.2.1.

[45] The Act, Section 5(d)(1).  Exh. A. See Map 6. Exh. G.

[46] LEIS 2.2.1.2.

[47] Federal Acknowledgement, Pg. 36 of 68. Exh. B.

[48] Gholson Declaration.  Exh. D.

*(vii)      Lida Ranch or Alternative*

The second parcel identified in the Act for potential purchase from a willing seller is the Lida Ranch site.[49]  The LEIS does not indicate the intended uses of the Lida parcel if acquired.  In the Senate Committee on Indian Affairs hearing concerning the Act before its passage, United States Department of the Interior Assistant Secretary Donald Barry was the principal representative for the Department of the Interior concerning the proposed legislation.  The *first question* asked of Assistant Secretary Barry by Senator Inouye, who presided over the hearing, was, "As you know, Mr. Secretary, this bill authorizes the purchase of Lida Ranch.  Can you tell us the reasons for acquiring this ranch and what is the tribe's connection to it?"[50]  Barry answered that it was important to the Tribe for its cultural history, and because it has water and "…the tribe views this as one of the few areas where there would be an opportunity for either economic development of some sort, or at least to provide additional community development.  I think, for that reason, Lida Ranch becomes very, very important to the Tribe."[51]

Senator Inouye went on to question Barry more closely concerning the acquisition and whether the Secretary was "moving to secure" the ranch and the Indian Rancheria parcels.  Barry responded that the Secretary had not yet begun any acquisition efforts but that upon the passage of the Act "the burden is then on us to follow through in good faith to look for a way of trying to achieve the benefits for the Tribe that the legislation would authorize."[52]  Senator Inouye later questioned Professor Charles Wilkinson on the matter of Lida Ranch, to confirm that the Act conveyed the necessary authority to the Secretary.[53]

Lida Ranch is and was an operating ranch, with significant water rights, and at the time of the Act it was thought to be a real economic development opportunity for the Tribe.  Lida Ranch was for sale for several years, but was taken off the market in 2014 and is no longer for sale.[54]  Even if it were still for sale, the Tribe does not believe that it is realistic to expect that Congress will appropriate $25 million for this purchase, and the Tribe does not want to spend several years waiting to find out.  The Tribe also does not believe that Lida Ranch presents the best opportunity for the Tribe.  The main justification for acquiring Lida Ranch would be to continue to operate it as a cattle ranch.[55]  The Secretary is, perhaps, in a better position than the Tribe to estimate how many tribal governments undertaking their first economic development project have taken ownership of a farm or ranching operation and run it successfully and for a profit, but

---

[49] The Act, Section 5(d)(2).  Exh. A. See Map 7. Exh. G.

[50] Hearing before the Committee on Indian Affairs, U.S. Senate, The Timbisha Homeland Act, 106th Congress, Second Session on S.2102 ("Hearing"). March 21, 2000. Pg. 26 of 105. Exh. H.

[51] Hearing. Pg. 27 of 105. Exh. H.

[52] Hearing. Pg. 27 of 105. Exh. H.

[53] Hearing. Pg. 38 of 105. Exh. H.  Senator Inouye: "Does this measure provide the necessary authority for the Department to proceed with the purchase of Lida Ranch?"  Professor Wilkinson: "Yes; I believe it does."

[54] Gholson Declaration, Lida Ranch attachment, "This Land Property is Off-Market." Exh. D.

[55] Gholson Declaration, Lida Ranch Advertisement, Exh. D, suggests that if the property were still for sale it could also be successfully developed for gold mining.  The Tribe has spent considerable resources over the past 20 years opposing gold mine development on Western Shoshone lands throughout Nevada and is not going to establish a gold mine on its trust property.

we believe the number is very, very small.  It is a business that appears to have low profit margins and significant risks.  This is in contrast to the opportunity presented by gaming, which is an economic development opportunity that has proven to be immediately successful for many tribes.

There are no criteria in the Act to guide the Secretary and the Tribe in deciding if Lida Ranch or another parcel should be acquired, or if another parcel is to be acquired how to decide what the appropriate parcel is.  There is also no guidance in the legislative history of the Act.  The alternative parcel was not discussed at the Senate hearing, in the LEIS, or in the Senate Committee on Indian Affairs Committee Report.[56]

In the absence of any other applicable legislative history, the record of Senator Inouye's line of questioning at the Senate Committee hearing and Assistant Secretary Barry's response looms large.  The exchange itself and the fact that it was Senator Inouye's first question demonstrates: 1) the United States Congress understood the significance of additional lands being acquired for the Tribe pursuant to the Act and considered it a matter of importance; and 2) notwithstanding the nondescript references to economic development potential in the "proposed uses" of the other parcels set forth in the LEIS,[57] Assistant Secretary Barry's comments indicate the Secretary's understanding that in truth there were only two parcels provided for in the Act that had real economic development potential for the Tribe: Furnace Creek and Lida Ranch.[58]

This legislative history can provide the Secretary and the Tribe with guidance for the acquisition of a parcel pursuant to Section 5(d)(2).  Congress was informed and understood that the success of the Act in the long run depended in part on the additional acquisitions.  The Secretary at the time the Act was passed, and Congress, understood that the reason for the acquisition of Lida Ranch was because the Tribe needed another parcel with real economic development potential.  The legislative history therefore provides guidance that the parcel to be acquired in the place of Lida Ranch should have real economic development potential.

The mutual agreement language of the Act does not contain any geographic restrictions on where the alternative parcel must be located.[59]  This is significant.  Even in the same Act the Centennial parcel replacement provision contains a specific geographic restriction.[60]  Congress

---

[56] Senate Report 106-327, *Providing to the Timbisha Shoshone a Permanent Land Base Within Its Aboriginal Homeland*, June 30, 2000. Exh. I.  The Report briefly addresses the Section: "Subsection (d) authorizes the Secretary to purchase, from willing sellers, and to take in trust for the Tribe, approximately 120 acres known as the Indian Rancheria Site, California, and approximately 2,340 acres comprising the Lida Ranch, Nevada, or another parcel mutually agreed upon by the Secretary and the Tribe, with appurtenant or separate water rights." Pg.8.
[57] *Supra*, footnotes 36, 38, 41, and 43.
[58] The LEIS and the Act itself paid extensive attention to the Furnace Creek parcel and its potential development. But the Act is silent on the uses of the four BLM parcels.  The LEIS provided a dismissive analysis of the four parcels identifying virtually identical uses for them all (single family residential and small-scale economic development) with no further discussion and no reference to what small-scale economic development would be feasible.  It is difficult to conclude that there was any real plan or even a serious expectation of economic development on the four BLM parcels.
[59] The Act, Section 5(d)(2). Exh. A.
[60] The Act, Section 5(b)(1)(C)(ii). Exh. A.

has also demonstrated in similar legislation that when Congress wants to place geographical restrictions on Tribal acquisitions, Congress understands how to do so.[61]

In the absence of legislative history providing other guidance, the Tribe submits that the most reasonable interpretation for this lack of geographical restriction was to ensure that the hands of the Secretary would not be tied if an alternative parcel was needed. To the extent that the lack of a defined geographical area in the Act constitutes an ambiguity, the applicable canon of construction requires the Secretary to interpret the language in the Act in the manner that favors the Tribe.[62]

Furthermore, the Act itself sets precedent for the acquisition of a parcel that is not adjacent to or even near the other parcels granted under the Act. The non-contiguous reservation established by the Act is spread out over a significant region.[63] The distance from the Death Valley Junction parcel to the Lida Community parcel is about 100 miles as the crow flies. When driving distances are taken into account, the distance from the Centennial parcel to the Lida Community parcel is over 130 miles.[64] Assistant Secretary Barry justified the spread out, non-contiguous nature of the initial reservation being established by explaining that it more accurately mirrored the Tribe's traditional use of its territory because of the scarcity of natural resources.[65] The distance between the Centennial parcel and the Ridgecrest parcel is about 45 miles, and the distance of the Ridgecrest parcel from the other trust parcels is well within the norms established by the Act by the distances between the other parcels.[66]

The Secretary is empowered by the Act to exercise her discretion to acquire a parcel that would be most likely to help the Tribe fulfill the purposes of the Act. The Secretary appreciates that modern tribal governments, lacking a tax base, must undertake economic development in order to sustainably operate their governments. It is reasonable for the Secretary to examine the Tribe's history of the past sixteen years and to conclude that the Act did not provide the Tribe with lands that were positioned for economic success. The Act provides the means and the

---

[61] "When Congress has wanted to limit the geographical range in which a restored tribe's reservation can be located, it has done so by specifying a particular tract of land as the restored tribes' reservation." *City of Roseville v. Norton*, 348 F.3d 1020, 1031 (D.C. Cir. 2003).

[62] "The basic Indian law canons of construction require that treaties, agreements, statutes, and executive orders be liberally construed in favor of the Indians." Cohen's Handbook of Federal Indian Law, Section 2.02[1] (2005 Edition). "The Supreme Court has held on numerous occasions that ambiguities in federal statutes are to be resolved in favor of the Indians." *City of Roseville v. Norton*, 348 F.3d 1020, 1032 (D.C. Cir. 2003) (*citing County of Yakima v. Confederated Tribes and Bands of Yakima Indian Nation*, 502 U.S. 251, 269 (1992); *Montana v. Blackfeet Tribe*, 471 U.S. 759, 766 (1985)).

[63] Map of the location of the trust parcels and Ridgecrest parcel. Exh. J.

[64] Distance and mileage chart of the trust parcels and Ridgecrest parcel. Exh. K.

[65] Hearing, written statement of Donald J. Barry: "These parcels would constitute a discontiguous reservation for the tribe. This is appropriate, given the desert environment in which essential resources like water are scarce and separated by vast distances. The existence of mining claims, the availability of infrastructure such as roads, power, and other services, and the fact that much of the land in this area has special resource designations, have resulted in the identification of several parcels to meet tribal needs, rather than a single contiguous parcel. In addition, a discontiguous reservation mirrors the way the Timbisha Shoshone people historically used their ancestral homelands, which covered more than eleven million acres." Pg. 44 of 105. Exh. H.

[66] Distance and mileage chart of the trust parcels and Ridgecrest parcel. Exh. K.

opportunity to rectify this situation. The potential for gaming as an economic opportunity for the Tribe is clearly contemplated by the Act, and identifying a parcel to be acquired for gaming purposes is consistent with the purposes of the Act.[67]

### c. Ridgecrest Parcel

The Ridgecrest parcel is approximately 26.48 acres in size and is located on China Lake Boulevard in the City of Ridgecrest, close to the entrance to the China Lake Base.[68] The Tribe and the City have entered into a site-specific Municipal Services Agreement anticipating a Tribally-operated gaming facility on the site.[69] The Tribe's developer, Global Investment Enterprise Ridgecrest, LLC, has entered into a Purchase and Sale Agreement with the City's Redevelopment Agency, giving the developer an exclusive option to purchase the Ridgecrest parcel.[70]

The City of Ridgecrest previously identified the Ridgecrest parcel and the immediately surrounding area as a business park and intended it for commercial purposes. China Lake Boulevard is one of the main north-south streets in the City. The Ridgecrest parcel is located on the west side of China Lake Boulevard near its northern end, close to the intersection with Inyokern Rd., a main east-west street that connects out to Highway 395. The Ridgecrest parcel lots are currently empty, and on the west side of China Lake Boulevard across from the Ridgecrest parcel are various restaurants and small businesses.

The Tribe considered several different parcels in and around the Ridgecrest area. In addition to its central location, one of the advantages of the selected site is that it was owned by an entity of the City, and the City was motivated to see the property developed. The Tribe and its developer have completed a market analysis and believe that the site can support a small to medium size gaming facility. The Tribe plans to initiate negotiations with the Governor of the State of California for a Class III gaming compact in the near future.

### 4. Initial Reservation

In 2008, the Department adopted 25 C.F.R. §292 to govern Indian lands decisions under IGRA. The regulations include criteria for making an initial reservation determination. 25 C.F.R. § 292.6. These provisions do not control the Secretary's decision under Section 5(d)(2) of the Act because the Act provides independent authority for the acquisition and the Secretary is not making an Indian lands determination. In addition, 25 C.F.R. §292.6 contains provisions that are contradictory or cannot feasibly be reconciled with the Act, which controls over the regulations.

However, the Tribe acknowledges that by making a discretionary decision to acquire a parcel pursuant to Section 5(d)(2) of the Act, the Secretary is in effect making a decision that the

---

[67] The Act, Section 7(c). Exh. A.
[68] Ridgecrest parcel maps. Exh. L.
[69] Municipal Services Agreement between Tribe and City of Ridgecrest. Exh. M.
[70] Purchase and Sale Agreement. Exh. C.

acquired parcel is eligible for gaming as part of the Tribe's initial reservation.  Therefore, the Secretary may usefully refer to 25. C.F.R. §292.6 for policy considerations.

The one policy that would clearly be of concern to the Secretary would be verification that the Tribe has historic connections to the Ridgecrest area.

*a.  Historic connections*

The Panamint Shoshone consisted of four bands, or districts.[71]  The boundaries between the bands were based on the locations of their villages and their commonly-utilized resources.  The boundaries between the Timbisha Shoshone and its neighbors were based on linguistic differences.  Steward wrote, under the heading "Western Independent Shoshoni Villages,"[72] and the subheading of "Eastern California": "These Shoshoni occupied the northern halves of Death Valley and Panamint Valley, all of Saline Valley, the southern end of Eureka Valley, the southern shore of Owens Lake, the Koso Mountain region, the northern edge of the Mojave Desert, and the eastern slope of the Sierra Nevada Mountains."[73]  Steward reviewed the villages, resources, and chiefs of the bands separately: Saline Valley,[74] Little Lake and Koso Mountains,[75] Panamint Valley,[76] and Northern Death Valley.[77]

According to the anthropological record, the City of Ridgecrest is not located exactly within the boundaries of any tribal group.  It was identified as "no permanent occupation" or that it was uncertain who occupied that area.[78]  It is undisputed that the closest aboriginal village sites and known resource use locations to the City of Ridgecrest belonged to the Little Lake Band of the Timbisha Shoshone.[79]  The distance from the southern linguistic boundary line of the Little Lake Band drawn by Steward to the Ridgecrest parcel is just over 5 miles.[80]  Furthermore, the Codding Report demonstrates that linguistic boundaries are not hard lines.  Known travel stories recorded by Steward suggest that the linguistic boundaries should be given a buffer zone of fifteen kilometers.[81]  With a fifteen kilometer (9.3 mile) buffer, the City of Ridgecrest is within the ancestral territory of the Timbisha Shoshone.[82]

It is known that the Kawaiisu traveled east from the Tehachapi mountains across the area of Ridgecrest on foraging trips, but their core territory remained in the Tehachapi mountains.[83]  In a

---

[71] We will refer the four subgroups of the Timbisha Shoshone as bands.  Steward referred to them as districts, and referred to the Panamint Shoshone as a band of the Shoshone Tribe.
[72] Julian Steward, Basin-Plateau Aboriginal Sociopolitical Groups Excerpt ("Steward"), Pg. 69. Exh. N.
[73] Steward, Pg. 71. Exh. N.
[74] Steward, Pg.76. Exh. N.
[75] Steward, Pg. 80. Exh. N.
[76] Steward, Pg. 84. Exh. N.
[77] Steward, Pg. 85. Exh. N.
[78] Codding Report, Pg. 11, and Figure 1, Pg. 13. Exh. E.
[79] Codding Report, Figure 2, Pg. 18, and Figure 4, Pg. 24. Exh. E.
[80] Codding Report, Figure 1, Pg. 13. Exh. E.
[81] Codding Report, Pg. 17. Exh. E.
[82] Codding Report, Figure 1, Pg. 13. Exh. E.
[83] Codding Report, Pg. 10. Exh. E.

letter to a colleague in 1955 Steward clarified that all of the boundaries around the Panamint Shoshone territory were a zone of intermarriage and bilingualism except for the Sierra mountains which formed a hard boundary.  He also noted that the major population centers of the Panamint Shoshone were on the western side of their territory, including the southern end of Owens Lake, Olancha, Little Lake, and Coso Hot Springs.[84]  These locations are all within the Little Lake Band's territory.

The Codding Report's review of the anthropological record concerning the southern territory boundary of the Panamint Shoshone is supported by the Indian Claims Commission findings.  The relevant section identifies a line from Argus Peak to the town of Brown, California.[85]  Brown is a small outpost still on the map just to the east of Highway 395, between Indian Wells and Little Lake.  This line is virtually the same as the linguistic boundary set forth by Steward (which is most likely where the ICC received its information).  Steward recorded that the Little Lake Band hunted near Brown: "Antelope were most numerous in Indian Wells Valley, near Brown, about ten miles south of Little Lake."[86]  Brown is about thirteen miles northwest of the Ridgecrest parcel, and Indian Wells is even closer.[87]

In the LEIS prepared for the Act, a map of the ancestral territory of the Tribe was included that has quite different boundaries from Steward and the ICC.[88]  The LEIS map was prepared by the anthropologist Katherine Fowler, who assisted the Timbisha Shoshone with its petition for federal acknowledgement and the negotiation of the Homeland Act.  In the course of her work, Dr. Fowler worked very closely with the residents of the Village.  When we shared the LEIS map with Dr. Codding and his team, their first reaction was confusion over the shape of the western boundary.  It has a strange western point apparently drawn to include Coso Hot Springs, but just barely.  They commented that "it looks more like a political boundary than a linguistic one."  The Codding Report simply concludes that the LEIS map "neglects the southwestern portion that is demonstrably Timbisha, specifically the Little Lake Band range."[89]

Given the clarity of Steward's work, and the fact that he unequivocally found that the territory of the Little Lake Band of the Panamint Shoshone extended to "the eastern slope of the Sierra Nevada Mountains" on the west,[90] it is hard to reconcile Dr. Fowler's map which leaves out the majority of the Little Lake Band's territory and does not extend anywhere near the slopes of the Sierra Nevada Mountains.  Again, Steward discussed all four bands of the Panamint Shoshone in sequence, and did not differentiate between the status of the Little Lake Band and the others.[91]

---

[84] Codding Report, Pg. 11. Exh. E.
[85] 11 ICC 387, 413, Finding #23. Exh. O.
[86] Steward, Pg. 81. Exh. N.
[87] Distance from Brown to Ridgecrest Map, Exh. P.
[88] LEIS Map, Exh. Q. Codding Report, Figure 1, Pg. 13. Exh. E. Note that Codding Report Figure 1 incorporates the LEIS map boundaries for reference.
[89] Codding Report, Pg. 12. Exh. E.
[90] Steward, Pg. 71. Exh. N.
[91] Steward, Pg. 71 to 85.  In Steward's review of the four districts, the Little Lake are discussed second. Exh. N.

Because the ancestral territory map discrepancy seems to beg for an explanation, we will include two possibilities for why Dr. Fowler's map looks so different, but we admit we do not know for certain. First, tribes who are seeking federal recognition have no assurance that they will be successful. It may be that the Village residents leading the recognition efforts decided it would be easier if they focused on the families of the residents of the Village and excluded the Little Lake Band descendants. This possibility is supported by the fact that although the Little Lake Band are well represented on the 1936 Census referenced in the Federal Acknowledgement,[92] the Little Lake Band descendants were excluded from the 1978 membership roll submitted to the United States.[93] It isn't that the Village residents didn't know the Little Lake Band descendants were still there. These groups were closely related family and all knew each other.

After the Tribe was federally recognized in 1983, a meeting was convened to ratify the first constitution of the Tribe in 1986. The first constitution restricted enrollment to those on the 1978 roll submitted to the Secretary. Although they were not on the 1978 roll and therefore not eligible for membership in the Tribe pursuant to the constitution's membership criteria, two descendants of the Little Lake Band attended the General Council meeting and voted on the constitution.[94]

In 1988, the Tribe amended the Enrollment Ordinance and included descendants of the Little Lake Band in the Tribe by adding Shoshone descendants of the 1936 Census. The minutes of the meeting indicate that the Tribal Council knew they were changing the enrollment criteria of the constitution and that the constitution would need to be amended.[95] Little Lake band descendants subsequently enrolled in the Tribe in substantial numbers. Many Little Lake descendants served as Tribal Council members and Chairpersons of the Tribe. For several years during the time of the negotiation of the Timbisha Homeland Act Leroy Jackson was the Chairman of the Tribe. Mr. Jackson is a Little Lake Band descendant, and is the son of Shirley Summers (a former Chairperson and one of the Little Lake descendants who was present and voted on the 1986 Constitution), and the brother of Eleanor Jackson (a current Tribal Council member). Mr. Jackson is currently the Tribal Environmental Director.

But, as the Secretary knows, in 2008 during a Tribal leadership dispute the Tribal Council led by Joe Kennedy attempted a mass disenrollment of the Little Lake Band descendants on the grounds that they were not eligible for membership in the Tribe because of the constitutional criteria limiting membership to the descendants of the 1978 roll. The first constitution had never been amended to match the Enrollment Ordinance as amended in 1988, 20 years prior. While the disenrollments were not ultimately successful, the effort was supported by many elder residents of the Village. The same elders who had excluded the Little Lake descendants from the 1978 roll and the first constitution, but opened the constitution ratification meeting to them and then invited the Little Lake descendants to enroll after 1988.

---

[92] Federal Acknowledgement, Pg. 6 of 68. Exh. B.
[93] Federal Acknowledgement, Pg. 6 of 68. Exh. B.
[94] January 25, 1986 General Council meeting sign-in sheet. Exh. R. Susan Bever-Parrie and Shirley Summers were Little Lake Band descendants.
[95] Minutes of Timbisha Shoshone Tribal Council, August 5, 1988, Pg. 3 of 4. Exh. S.

Based on this history, the second possibility is that there has been ongoing family tension between the Village residents and the Little Lake descendants that pre-dates federal recognition, and that the Village residents have simply gone back and forth on wanting the Little Lake descendants to be part of the Tribe.  They may have instructed Dr. Fowler to leave out the Little Lake territory as part of this ongoing tension.

Regardless of the accuracy of our guesses, the LEIS map's western and southwestern boundaries are completely inconsistent with the anthropological record.

### b.  Modern Connections

The initial reservation criteria at 25 C.F.R. §292.6 also require tribes to demonstrate modern connections to the land.  The Tribe does not believe that its modern connections to the Ridgecrest area should be relevant for the Secretary's decision.  The Tribe did not have modern connections to all of the areas where it received trust land under the Act, suggesting that this was not a Congressional priority for the Tribe.  This is reasonable under the circumstances because the availability of land within the Tribe's ancestral territory raises unusual issues.  Between Death Valley National Park and the China Lake Base, a substantial percentage of the Tribe's ancestral territory is in a restricted status which makes recovery of Tribal jurisdiction extremely unlikely or impossible.[96]  As a result, the vast majority of Tribal members have moved outside of the Tribe's ancestral territory.  The highest concentration of Tribal members is now in the Bishop and Big Pine area of California,[97] which is a Paiute area and the home of Paiute tribes with which the Timbisha Shoshone have long-standing historic and pre-historic relationships.

For the sake of thoroughness, the Tribe submits that it does have modern connections to the Ridgecrest area.  Former China Lake Base archaeologist Russell Kaldenberg wrote about his education by the Little Lake Band descendants concerning their way of life in the Coso Mountains.[98]  The Tribe has a quarterly meeting with the China Lake Base to discuss upcoming projects.[99]  The Tribe has an agreement with the China Lake Base to permit access to Coso Hot Springs for spiritual and cultural purposes.[100]  The Tribe, and specifically the Little Lake Band

---

[96] See attached maps showing the Tribe's ancestral territory utilizing Steward's map, juxtaposed with the Death Valley National Park and the Naval Air Weapons Station China Lake.  Exh. T. Death Valley National Park is over 3 million acres in size, and is the largest Park in the lower 48 states.  Naval Air Weapons Station China Lake is over 1 million acres in size, and is the largest single landholding of the United States Navy.  Together, the Park and the Base occupy about 70% of the Tribe's ancestral territory.  See also Hearing, written testimony of Assistant Secretary Donald J. Barry, Pg. 44 of 105. Exh. H.

[97] See attached map of the population of Tribal members in the Tribe's ancestral territory and neighboring areas Exh. U.

[98] Russell L. Kaldenberg, *Introduction to the Archaeology of the Naval Air Weapons Station, China Lake, California*, Pacific Coast Archaeological Society Quarterly, Volume 43, Numbers 1 and 2. "When the Base was created in 1943, local Koso Shoshone families still lived on it part time… In a series of personal interviews and field trips with some of the Koso people, I have learned a great deal about their life in the Coso Mountains and Darwin Wash areas." Pg. 4, Exh. V. (Digital version only provided, document cannot be printed).

[99] Codding Report, Pg. 27. Exh. E.

[100] Codding Report, Pg. 27. Exh. E.

descendants, have informal agreements with the China Lake Base to visit their ancestral home,[101] to organize petroglyph tours, and to harvest pine nuts and hunt.[102]  The City of Ridgecrest also regularly contacts the Tribe to invite Tribal representatives to the annual Petroglyph festival.[103]

5.  **Conclusion**

The Timbisha Shoshone Tribe requests, pursuant to Tribal Council Resolution 2016-19, that the Secretary enter into a Memorandum of Agreement to mutually agree to acquire the Ridgecrest parcel pursuant to the authority set forth at Section 5(d)(2) of the Timbisha Homeland Act.  The acquisition of the Ridgecrest parcel for the benefit of the Tribe is consistent with the specific language, purposes, and legislative history of the Act, and it is the most beneficial means for the Secretary to fully implement the Act on behalf of the Tribe and its members.

---

[101] Picture of Little Lake descendants visiting their ancestral home within the restricted Naval Air Weapons Station China Lake.  The elder in the middle of the picture is former Tribal Chairperson Shirley Summers (deceased).  She is standing in front of the remains of the Wrinkle family home where her parents and grandparents once lived, before being forcibly removed by the United States in 1943.  Exh. F.  Codding Report, Pg. 25.  Exh. E.
[102] Codding Report, Pg. 27.  Exh. E.
[103] Declaration of Chairman Gholson.  Exh. D.

# EXHIBIT D

**Addendum No. 1 to
Memorandum in Support of the
Timbisha Shoshone Tribe Request to the Secretary of the Interior
for an MOA to Mutually Agree to Acquire
the Ridgecrest Parcel in Trust for the Tribe
Pursuant to Section 5(d)(2) of the Timbisha Homeland Act**

**For FOIA Purposes this is a Voluntary Submission of Financial/Commercial
Confidential Information on Behalf of the Tribe**

1. <u>**Introduction**</u>

On September 22, 2016, the Timbisha Shoshone Tribe (the "Tribe") submitted Tribal Council Resolution 2016-19, requesting the Secretary of the Interior to enter into a Memorandum of Agreement with the Tribe approving the acquisition of a parcel in Ridgecrest, California by mutual agreement pursuant to Section 5(d)(2) of the Timbisha Shoshone Homeland Act (the "Act").  The Resolution was accompanied by a Memorandum in support of the request.

Please accept this Addendum No. 1 to the Memorandum submitted by the Tribe with regard to the above-referenced request.

The Tribe has reconsidered its position on a critical aspect of the acquisition.  In the Memorandum the Tribe opined that Section 5(d) of the Act provides for a discretionary acquisition, not a mandatory acquisition.  After further review, the Tribe submits this Addendum No. 1 setting forth the reasoning why the acquisition of the Ridgecrest parcel should be considered a mandatory acquisition under the Timbisha Shoshone Homeland Act.

2. <u>**Mandatory Acquisition**</u>

   a. *The Timbisha Shoshone Homeland Act*

   The Act provides in relevant part:

   (d) ADDITIONAL TRUST RESOURCES.—The Secretary may purchase from willing sellers the following parcels and appurtenant water rights, or the water rights separately, to be taken into trust for the Tribe:
       (1) Indian Rancheria Site, California, an area of approximately 120 acres, as generally depicted on the map entitled ''Indian Rancheria Site, California'' numbered Map #6 and dated December 3, 1999.

(2) Lida Ranch, Nevada, an area of approximately 2,340 acres, as generally depicted on the map entitled "Lida Ranch" numbered Map #7 and dated April 6, 2000, or another parcel mutually agreed upon by the Secretary and the Tribe.

The Act provides discretion for the Secretary in one particular stage of the implementation of this section of the Act.  It is within the discretion of the Secretary to make the decision to purchase the two additional parcels for the Tribe.  The plain language of the statute states that the Secretary "may" purchase the parcels.  The use of the word "may" indicates the Congressional intent that the Secretary utilize his/her discretion in making this decision.  It is also within the discretion of the Secretary to "mutually agree" on a parcel in place of Lida Ranch.[1]  The word "agree" indicates that both parties, the Secretary and the Tribe, can exercise independent discretion in the selection of an alternative parcel.  Once the mutual agreement has been reached, the Secretary and the Tribe have agreed that the Secretary will purchase a particular parcel for the benefit of the Tribe in the place of Lida Ranch.

The plain language of the Act provides that the discretionary aspect of the decision ends after that step.  Once the Secretary has decided to purchase the parcel, the statute provides for the parcel "to be taken into trust for the Tribe."  In the plain language of the statute the phrase "to be taken into trust for the Tribe" is not qualified by the word "may" in the section; the word "may" only qualifies the purchase decision.  Taken by itself, the phrase "to be taken into trust for the Tribe" is directive and does not imply any discretion.

This is logical in the context of the section and the entire Act.  It would be nonsensical for the Secretary to make the discretionary decision to purchase a parcel pursuant to this authority and then not have it taken into trust for the benefit of the Tribe.  This Section (d) is entitled "Additional Trust Resources."  The purpose of the Act is to establish an initial reservation for the Tribe.  Any lands acquired pursuant to this Section (d)(2) are considered to be part of the Tribe's initial reservation for purposes of the Indian Gaming Regulatory Act pursuant to Section 7(c) of the Act.  Any parcel acquired by the authority of this provision *must* be accepted into trust in order to effectuate the intent of the Act.

### b.  Timbisha Homeland Act Legislative History

The legislative history of the Act does not address the question of mandatory versus discretionary acquisitions under Section 5(d).  In Senator Inouye's questioning of Assistant Secretary Barry in the Senate hearing, the Senator's first question was specifically about the acquisition of Lida Ranch.  "Is the Department moving to secure title to this land, this Lida Ranch?"[2]  It was clear that he viewed the exercise of the Secretary's authority to acquire additional lands under Section 5(d) to be a priority.  Barry responded, "I think we are waiting for

---

[1] The Tribe's position on the reasoning behind purchasing the Ridgecrest parcel instead of Lida Ranch under the Authority of the Act is set forth in the Memorandum.

[2] Hearing, Pg. 27 of 105. Exh. H.

Congress to authorize us to undertake this particular endeavor.  I think if this bill is passed the burden then falls on the Department to pursue this further, follow up with specific proposals regarding funding for these acquisitions."[3]  Senator Inouye pushed Assistant Secretary Barry on the process, asking, "So, upon passage of this measure and its signing into law, the Department will take that as direction to provide funds to secure the title to this land?"[4]  Barry responded, "I think the burden is then on us to follow through in good faith to look for a way of trying to achieve the benefits for the tribe that the legislation would authorize."[5]

The exchange between Senator Inouye and Assistant Secretary Barry suggests that the acquisition process under Section 5(d) was intended to be brief, with the goal of quickly providing the Tribe with the full benefits authorized by the legislation.  The exchange does not suggest that a lengthy, discretionary 25 CFR 151 off-reservation fee to trust acquisition was anticipated for the implementation of Section 5(d).

Senator Inouye also questioned Professor Wilkinson concerning Lida Ranch, "Does this measure provide the necessary authority for the Department to proceed with the purchase of Lida Ranch?"[6]  Professor Wilkinson responded, "Yes, I believe it does."[7]  Again, while the words "mandatory" and "discretionary" are not being used in this exchange, Senator Inouye's clear intent was to insure that the Department had the legal authority to proceed with the purchases authorized by Section 5(d) immediately, which is inconsistent with a lengthy off-reservation fee to trust acquisition process.

In the Legislative EIS prepared for the Act there was no reference to a need for additional processes, including NEPA, for the acquisition of the additional parcels pursuant to Section 5(d).

*c.  Precedent*

Congress has adopted numerous statutes authorizing the Secretary to accept lands into trust for the benefit of specific tribes through mandatory or discretionary processes.  In general, the statutes very clearly set forth whether the acquisition are intended to mandatory or discretionary by the use of "shall" or "may" to qualify the specific acquisition language.

For example, the Auburn Indian Restoration Act provides:

> The Secretary *shall* accept any real property located in Placer County, California, for the benefit of the Tribe if conveyed or otherwise transferred to the Secretary if, at the time of such conveyance or transfer, there are no adverse legal claims on such

---

[3] Id.
[4] Id.
[5] Id.
[6] Hearing, Pg. 38 of 105. Exh. H.
[7] Id.

property, including any outstanding liens, mortgages, or taxes owed.
The Secretary *may* accept any additional acreage in the service area
of the Tribe pursuant to the authority of the Secretary under the Act
of June 18, 1934 (48 Stat. 984 et seq., chapter 576; 25 U.S.C. 461 et
seq.).  Section 104, 25 U.S.C. 1300l (emphasis added).

The intent of Congress was straightforward.  Congress intended the acquisition of lands
in Placer County to be mandatory, by using the word "shall," and also intended the acquisition of
lands outside of Placer County to be discretionary, by using the word "may."  Note also that the
only consideration of different steps in the process is that the Secretary must verify there are no
outstanding liens, mortgages, or taxes owed.[8]  There is no authority to purchase lands for the
tribe.

Indeed, of the other similar Acts of Congress adopted around the same time as the
Timbisha Shoshone Homeland Act, none of them provide the Secretary with the authority to
purchase lands for the tribe. For example, see the Paskenta Band of Nomlaki Indians Restoration
Act, 25 U.S.C. §1300m; the Graton Rancheria Restoration Act, 25 U.S.C. §1300n; and the
Menominee Tribe of Wisconsin Restoration of Federal Supervision, 25 U.S.C. § 903.  None of
these statutes provides the Secretary with the authority to purchase specific parcels for the tribe.

Because of the Act's unique language, a better precedent to look to might be the land
consolidation statutes for specific South Dakota tribes.  In *Todd County, South Dakota v.
Aberdeen Area Director, Bureau of Indian Affairs*, 33 IBIA 110 (1999), the County challenged
the BIA's decision to undertake a mandatory acquisition on the grounds that it should have been
discretionary under the statute.  The Congressional Act in question was the Isolated Tracts Act,
Act of Dec. 11, 1963, Pub. L. No. 88-196, 77 Stat. 349.  The Isolated Tracts Act provides that at
the request of the Rosebud Sioux Tribe the Secretary is "authorized" to "exchange or sell" tribal
interests in isolated tracts of land located within certain counties.  The statute includes criteria the
Secretary must apply to determine if the lands are appropriate for sale or exchange.  If the
Secretary determines that sale or exchange is appropriate, the statute provides that the land
acquired "shall be taken in the name of the United States in trust for the tribe."

The parties agreed that the first step of the process, involving either the sale or mortgage
of existing trust interests, is discretionary for the Secretary ("authorize" indicates discretion is
being delegated).  The dispute concerned the second step of the process, the acquisition of new
lands into trust, and whether it was discretionary or mandatory.  The County argued that because
the first step of the process was discretionary, the second had to be as well.[9]  The IBIA found
that, while the statute is not as clearly mandatory as others Congress has adopted, the statute

---

[8] These are the matters covered by the existing mandatory acquisition process.

[9] "It [County] argues that the Secretary has control over the outcome of the transactions authorized by the Isolated
Tracts Act because he has the authority to approve sales, exchanges, or mortgages of isolated tracts, knowing that
those approvals will result in the trust acquisition of other land. Thus, Appellant reasons, the statute is not mandatory
with respect to this trust acquisition because it gives the Secretary decision-making authority." *Id*. at 115.

intends that the Secretary will have discretion with regard to the first step, but not with regard to the second.[10]

This is similar to the provisions of the Timbisha Shoshone Homeland Act.  It is not as clearly mandatory as other tribal restoration statutes.  But the process involves two steps.  The Secretary's decision to purchase a parcel from a willing seller is discretionary, but once that decision is made the next step of taking the land into trust for the benefit of the Tribe is not discretionary.

Another precedent is the White Earth Reservation Land Settlement Act ("WELSA"). *State of Minnesota v. Acting Midwest Regional Director, Bureau of Indian Affairs*, 47 IBIA 122 (2008).  Congress adopted WELSA giving the Tribe a judgment fund, and provided that any lands purchased within the boundaries of the White Earth Reservation with the funds shall be held in trust by the United States.  The IBIA found that the Secretary had a mandatory, non-discretionary duty to accept the lands into trust upon the occurrence of two preconditions: the land must be located within the reservation and have been purchased with WELSA funds.[11]  This decision was upheld by the federal court.[12]

In Timbisha's case, the precondition for the mandatory acquisition is simply that the Secretary has made the decision to purchase the property from a willing seller.

To the extent that the statute is determined to be ambiguous on this issue, the canons of statutory construction require that the statute is "to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit."  *Todd County,* 33 IBIA 110, 113 (citing *County of Yakima v. Confederated Bands and Tribes of the Yakima Indian Nation*, 502 U.S. 251, 269 (1992), quoting from *Montana v. Blackfeet Tribe*, 471 U.S. 759, 766 (1985)).

### 3.  <u>The Discretionary Decision to Purchase and the Mutual Agreement</u>

The Timbisha Shoshone Homeland Act authorizes the Secretary to mutually agree with the Tribe to substitute Lida Ranch with another parcel.  If the Secretary enters into a mutual agreement identifying the Ridgecrest parcel pursuant to Section 5(d)(2) of the Act, there is no reason why the mutual agreement should not also indicate the Secretary's decision to purchase. The Secretary's decision to mutually agree on a parcel necessarily means that the Secretary has made the decision to purchase the parcel for the benefit of the Tribe.

The implementation of the decision to purchase is conditioned on the successful completion of the mandatory fee to trust process.  The mandatory fee to trust process provides the Department with the opportunity to check that the title is clear and to identify and address

---

[10] "Once the requirements concerning isolated tracts have been satisfied with regard to any particular disposition, the Secretary has no further opportunity to exercise judgment." *Id.* at 116.
[11] Id. at 127.
[12] *Mahnomen County, MN v. Bureau of Indian Affairs*, 604 F.Supp.2d 1252 (D. MN, 2009).

any other issues of concern, including environmental matters.  *BIA Fee to Trust Handbook*, 3.1.3., Step 4 and Step 6.